IN THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA      :
     :
           v.      :      Case No. 13-cr-20371
     :      Judge Victoria A. Roberts
DOREEN HENDRICKSON      :

**DOREEN HENDRICKSON'S SENTENCING MEMORANDUM**

     Doreen Hendrickson, by and through her undersigned counsel, submits this Sentencing Memorandum to assist the Court in determining a fair and just sentence, particularly, one consistent with 18 U.S.C. § 3553's parsimony provision requiring the Court to impose a sentence sufficient, but not greater than that necessary, to meet the goals of sentencing.  Specifically, Mrs. Hendrickson urges the Court to impose a non-custodial sentence.

I.      **INTRODUCTION**

     On April 9, 2015, Doreen Hendrickson will appear for sentencing following her conviction (after a second jury trial, the first having ended in a hung jury) on one count of contempt of court in violation of 18 USC § 401(3).  Essentially, Mrs. Hendrickson will be sentenced for having the temerity to stand behind her convictions and not cower to the government's efforts to silence her in expressing her sincerely held views concerning the Internal Revenue Code.

     As the Court knows, and the government highlights, Mrs. Hendrickson takes umbrage with the jury's verdict, as well as the validity of her being subject to trial for exercising her right to control the content of her expressions of belief; especially those concerning the legal nature of the income tax and what classes of earnings qualify for that tax.  Mrs. Hendrickson will not use

this Sentencing Memorandum to reiterate or reargue those issues.  Nor does Mrs. Hendrickson submit this Memorandum in an effort to half-heartedly accept responsibility for conduct she does not believe to be criminal.  In fact, Mrs. Hendrickson is not ashamed or embarrassed by her conduct.

Notwithstanding her belief that she has been wrongfully charged and convicted, Mrs. Hendrickson understands that her case must follow a process and that process requires being sentenced before she can appeal the jury's verdict.  In facing sentencing, Mrs. Hendrickson appreciates the Court must assume her guilty and respect the jury's verdict.  Nonetheless, the Court should not impose a sentence that includes any period of incarceration, but rather sentence Mrs. Hendrickson to period of probation that includes whatever conditions the Court deems appropriate.

This case supports imposing a probationary sentence for a number of reasons.  First, notwithstanding what the government might think about Mrs. Hendrickson, there can be no question that her personal history and characteristics support a mitigated sentence.  Mrs. Hendrickson is a loving wife and mother who enjoys a solid reputation among those who know her best.  Doreen Hendrickson is a model citizen - a veritable Jeffersonian ideal of civic virtue.  A voter in every election since reaching the age of majority, she has run for and held political office and served as an active campaigner for others.  She is committed to her Country and has an abiding faith in its laws, including the Internal Revenue Code.

Mrs. Hendrickson is a valued and cherished member of and asset to her community.  As stated by those who have written letters on her behalf to the Court, Doreen Hendrickson is:

> [T]he kind of person that places the interests of others above her own;
>
> [A] highly principled person — devoted not only to her husband and children but to the community as a whole;
>
> [O]f high moral character and a positive contributor to our community . . . hardworking and honest;

Mrs. Hendrickson's reputation and high moral character support a non-custodial sentence.

Second, the Federal Sentencing Guidelines do not recommend a period of incarceration and, thus, support the probationary sentence Mrs. Hendrickson is requesting. The crime for which she will be sentenced - criminal contempt, as codified at 18 U.S.C. § 401(3) - presents unique considerations from a sentencing perspective. As discussed in detail below, there is no calculable sentencing guideline directly relating to Mrs. Hendrickson's purported violation of 18 U.S.C. § 401(3). Instead, the applicable governing guideline, U.S.S.G. § 2J1.1, directs the Court to U.S.S.G. § 2X5.1, which instructs the Court to apply "the most analogous offense guideline [and if] there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall govern."

Notwithstanding the Probation Department's and government's positions to the contrary, there is no analogous offense guideline that properly addresses Mrs. Hendrickson's offense conduct. Both the government and the Probation Department suggest the Court apply the fraud guidelines at U.S.S.G. § 2B1.1, which clearly do not apply.[1] Because no particular advisory

---

[1] The government's suggested application of the fraud guidelines reflects a sea change from its earlier articulated position. Mrs. Hendrickson asks the Court to remember that Tax Division Attorney Jeffrey Bender, representing the United States, previously indicated that if they managed a conviction in this case, the government believed the tax guidelines would apply and would yield an advisory imprisonment range of less than twelve (12) months. *See* Exhibit 1, transcript of *Faretta* hearing dated July 29, 2013, p. 6. Now, the winds have shifted and the government suggests that the fraud guidelines apply. As discussed below, there is no advisory

guideline section applies, sentencing in this matter is exclusively guided by the sentencing considerations set forth at 18 U.S.C. § 3553 and the Court is not otherwise bound by the guideline calculation proposed by the government and Probation Department.  In exercising its discretion, Mrs. Hendrickson urges the Court to impose a probationary sentence.

Alternatively, even assuming the fraud guidelines apply, they themselves advise a non-custodial sentence.  In its Sentencing Memorandum, the government seems to propose that the offense in this case be viewed as a "tax fraud crime," yet the acts of criminal contempt alleged in the compound single count of conviction involved no such crime.  There was no fraud and certainly no tax fraud involved in any of Mrs. Hendrickson's actions.  The orders Mrs. Hendrickson ostensibly violated make no reference whatsoever to fraud and are accompanied by judicial findings - which led to the issuance of those orders - that do not recognize any suggestion of fraud.  To the contrary, Mrs. Hendrickson took explicit steps to ensure that no one, including the United States, could possibly have been deceived or suffer from any misunderstanding of anything she did relevant to this case.

Further, Mrs. Hendrickson did not fail to file any return required under any tax statute, nor say anything on any tax-related document that she does not believe to be true, complete and correct to the best of her knowledge and belief, all of which was thoroughly established at her trial.  Nor did the acts alleged in the Indictment occasion or intend any loss to the government.  There was no "tax crime;" there was no fraud crime; hence, treating this case as either would be wholly inappropriate.

---

guideline applicable to this case and the Court should not fall into the trap of finding one where one does not exist.  Simply stated, the Sentencing Guidelines do not apply and, even if they do, they certainly do not advise the Court to impose a period of incarceration.

Finally, although Mrs. Hendrickson does not seek to re-litigate her innocence herein, the Court in dispatching its sentencing duties should consider the fragility of her conviction. Like the charges laid out in the Indictment and the character of the underlying evidence, the disposition of this case crosses into unique territory. Notably, that disposition makes clear that whatever the government may have accomplished, it by no means amounts to an unambiguous demonstration of Mrs. Hendrickson being guilty of an offense meriting a sentence of imprisonment. The verdict in this case was reached after the government first failed to convict Mrs. Hendrickson at trial - despite the fact that she represented herself and was wholly inexperienced - and only succeeded in securing a guilty verdict because of what Mrs. Hendrickson in good faith believes was a dramatically-reduced burden of proof.[2]

In light of these factors, this Court, in exercising its statutory obligation to impose the least-restrictive sentence necessary to accomplish the goals of sentencing, should impose probation.

## II.    ANALYSIS

Pursuant to statutory mandate, this Court must impose a sentence that is "sufficient but not greater than necessary to comply with the purposes of sentencing." 18 U.S.C. § 3553. The

---

[2] As stated in her post-trial pleadings, Mrs. Hendrickson believes the Court erred in failing to require the jury to reach unanimity concerning which act(s) of alleged contempt she committed. Although this issue may be aired in an appeal, and although Mrs. Hendrickson does not intend to re-litigate her culpability, this lack of unanimity is significant to the sentencing process. For example, because of the absence of unanimity, one cannot rely on the jury's verdict to support the proposition that Mrs. Hendrickson was convicted of any conduct supporting the application of the fraud-related offense characteristics proposed at ¶¶ 29 and 30 of the PIR. Also, a two point increase to her criminal history calculation is not justified because the Court does not know whether the jury agreed that in committing contempt, Mrs. Hendrickson committed criminal acts during the time period that she was on probation or after this time period. These issues are discussed more-fully below.

Sixth Circuit Court of Appeals directs district courts, when implementing this mandate, to first consider the Federal Sentencing Guidelines. Specifically, the Sixth Circuit has stated:

> Initially, we must fully insure the district court committed no significant procedural error, such as failing to calculate, or improperly calculating, the guideline range, treating the guidelines as mandatory, failing to consider the Section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence. *Gall*, 522 U.S. at 51, 128 S. Ct. 586. In particular, the sentencing judge should set forth enough to satisfy the appellate court that he [or she] has considered the parties' arguments and has a reasoned basis for exercising its own legal decision making. *Rita*, 551 U.S. at 356, 127 S. Ct. 2456.
>
> * * *
>
> We next consider whether [a sentence was] substantively reasonable in light of the sentencing factors recited in Section 3553(a). A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, basing the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor. *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008).

*United States v. Robinson*, 669 F.3d 767, 773-4 (6th Cir. 2012).

In Mrs. Hendrickson's case, the Sentencing Guidelines explicitly do not apply, but should the Court feel it must first consider and ultimately apply them, the guidelines only represent one of a number of equal factors to be considered in dispatching the Court's statutory obligation to impose a minimally sufficient sentence. Further, should the Court feel that the guidelines are relevant or useful for any reason, this Court may not consider them as presumptively reasonable. *United States v. Nelson*, 129 S. Ct. 890-2 (2009) ("our cases do not allow a sentencing court to presume that a sentence within the applicable guideline range is reasonable" and . . . "that the

guidelines are not mandatory on sentencing courts."

In light of these authorities, clearly, the Court must consider all the § 3553(a) factors while placing no greater weight on any one of them, including the Sentencing Guidelines, if they are considered at all.

**A.**     **Sentencing Guideline Calculation/Objections to PIR**

**1.**     **There is no Offense Guideline that Governs this Case.**

The Probation Department has erroneously concluded that the Sentencing Guidelines suggest a total offense level of "12." The Probation Department, at PIR ¶¶ 28-37, applies the fraud guidelines where there is no basis to do so. Under Appendix A (Statutory Index), a conviction under 18 U.S.C. § 401 is governed by U.S.S.G. § 2J1.1.[3] That section specifically refers the reader to U.S.S.G. § 2X5.1, which instructs a sentencing court to identify a guideline analogous to the case before it and apply its terms at sentencing. If no such analogous guideline exists, the Court need not consider the guidelines in imposing sentence, but rather simply applies the non-guideline sentencing factors at 18 U.S.C. 3553(a). *See* U.S.S.G. § 2X5.1 ("If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control").

Here, the Probation Department applies the fraud guidelines set forth at U.S.S.G. § 2B1.1. In doing so, the Probation Department wrongly concludes that Mrs. Hendrickson's case reflects a scenario similar to the one referenced in the commentary to U.S.S.G. § 2J1.1; specifically, that this case involves contempt of an order enjoining fraudulent behavior. (*See*

---

[3] U.S.S.G. § 1B1.1 outlines the steps in applying the Sentencing Guidelines. In the first instance, the Court must determine the appropriate applicable offense guideline from Chapter Two of the Guidelines. U.S.S.G. § 1B1.1(a)(1). In doing so, the Court must refer to the Statutory Index (Appendix A) to determine the appropriate Chapter Two guideline to apply. U.S.S.G. § 1B1.2(a). For convictions under 18 U.S.C. § 401, the Statutory Index refers the reader to U.S.S.G. § 2J1.1.

U.S.S.G. § 2J1.1, Application Note, stating "In a case involving a violation of a judicial order enjoining fraudulent behavior, the most analogous guideline is §2B1.1. In such a case, §2B1.1(b)(9)(C) (pertaining to a violation of a prior, specific judicial order) ordinarily would apply*"*). There is, however, no basis to conclude that the Court's Orders - for which Mrs. Hendrickson is now held in contempt - enjoined fraudulent behavior. Additionally, Mrs. Hendrickson engaged in no fraudulent behavior, was neither charged with nor found guilty of engaging in any fraudulent conduct and the orders associated with the Indictment do not mention or concern fraud. Rather, all of her disclosures were completely transparent. Therefore, there is no basis to apply U.S.S.G. § 2B1.1 in this case.

At no point were any returns Mrs. Hendrickson filed deemed "fraudulent" by the Court. Indeed, throughout the entirety of the Amended Judgment - in which the Court's "findings of fact" and injunctions are made - the terms "fraud" and "fraudulent" do not appear. *See* Exhibit 2, May 2, 2007 Amended Judgment and Order of Permanent Injunction. This is so even though the government's Complaint resulting in the Order of Permanent Injunction alleged fraud eighteen (18) times. The Court found no fraud, fraud was not alleged in the Indictment and, certainly, none was proven by the government at trial.

Additionally, given the absence of a jury instruction and special jury verdict requiring unanimity with respect to the alleged contemptuous acts that formed the basis of the charges against Mrs. Hendrickson,[4] it is impossible to say that even a single juror found that Mrs. Hendrickson criminally failed to file amended returns as per the Court's Order. But even had that been validly found to have happened, it would not constitute any kind of fraud. One cannot commit fraud by doing nothing.

---

[4] *See* Exhibit 3, transcript of proceedings dated July 25, 2014, p. 99, lines 5-16.

Even if it were possible to know if the jury had found Mrs. Hendrickson to have violated the Court's Order not to file returns based on the "false" and "frivolous" (not "fraudulent"[5]) notion about the limits of the income tax (incorrectly) ascribed to *Cracking the Code...*, per the Court's Order, no fraud can be inferred. It is not possible to commit fraud when one has taken care to ensure that all parties are fully apprised of all relevant facts, as Mrs. Hendrickson did with respect to her conduct in this case. This is true of all of Mrs. Hendrickson's filings, despite the "found facts" section of the "Amended Judgment and Order of Permanent Injunction" stating that the IRS was "unaware that Defendants report was false" or that she had received payments subject to income tax. *See* Exhibit 4, pp. 3, 5 of Amended Judgment. This does not support a finding of fraud. In fact, the trial testimony supports a contrary finding.

At trial, Robert Metcalfe admitted that the IRS was fully aware of the W-2 and 1099 assertions of Mr. and Mrs. Hendrickson and that with their claims for refund, they had directed the agency's attention to those "information return" payment reports and allegations. Therefore, Doreen Hendrickson took careful and specific steps to ensure that nothing would be done by the IRS in ignorance. *See* Exhibit 5, Trial Transcript Vol. 3, July 23, 2014, pp. 21-23. The same is true of Mrs. Hendrickson's 2008 return.

Mrs. Hendrickson acted with a complete absence of fraud. She disclosed exactly what she received as earnings, disclosed her characterizations of those earnings as she believed them to be and submitted a tax return accordingly. Complete disclosure, even if substantively disagreeable, is not fraud.

Given the absence of fraud, U.S.S.G. § 2B1.1 does not govern Mrs. Hendrickson's case. Nor does any other offense guideline set forth at Chapter 2 of the Sentencing Guidelines.

---

[5] *See* Exhibit 2, May 2, 2007 Order and Permanent Injunction, pp. 7-8.

Because of the unique circumstances underlying this matter, it is unsurprising that no particular guidelines section would correspond to the case at bar. The Court should not attempt to force an otherwise-inapplicable guideline scheme onto Mrs. Hendrickson's case, as the government and Probation Department would suggest. Rather, the Court should do as the guidelines instruct, forego applying any particular section of the guidelines and simply sentence Mrs. Hendrickson in accordance with the sentencing factors set forth at 18 U.S.C. § 3553(a).

> **2.      Mrs. Hendrickson's Conduct produced no "Loss" or "Intended Loss" to the United States.**

Assuming that U.S.S.G. § 2B1.1 does apply, there is no basis to increase Mrs. Hendrickson's base offense level for any loss, whether actual or intended. The Indictment alleges separate and distinct bases for contempt. One concerns the March 23, 2009 filing of a tax return through which Mrs. Hendrickson sought a $5.00 refund. The other alleges the failure to file amended returns in a manner deemed satisfactory with the Court's Order. As stated previously, it is impossible to determine which of these alleged contemptuous acts the jury found Mrs. Hendrickson to have committed. However, neither alleged act of contempt supports a loss-based enhancement under U.S.S.G. § 2B1.1(b).

> **a)      No Loss Can Be Inferred From the Mere Failure to File Amended 2002 and 2003 Tax Returns as Directed by the Court.**

Mrs. Hendrickson's alleged criminal failure to file "amended returns" -- even if deemed to have been found true by the jury -- can neither have occasioned nor intended any loss to the United States. In fact, the opposite is true.

As an initial matter, Mrs. Hendrickson cannot be deemed to have "intended a loss" to the

United States under any circumstances. For a loss to have been "intended" in the sense meant by the sentencing guidelines, Mrs. Hendrickson would have to believe that the United States had a rightful claim to her money that was thwarted by her actions. Mrs. Hendrickson sincerely does not believe this - a fact thoroughly established at trial - however much the government argued that she ought to believe otherwise.

Nor was any loss caused by Mrs. Hendrickson's alleged failure to file amended tax returns. The government argues that [Mr. and] Mrs. Hendrickson's tax liabilities were established entirely independently of any of the couple's actions or omissions. Indeed, the assertion of independently-established existing liabilities was the basis for the government's suit in 2006, from which the orders involved in this case emanated. These were purportedly established despite Mrs. Hendrickson having never filed "amended returns." Thus, Mrs. Hendrickson's alleged failure to file amended returns as directed by the Court is irrelevant to those previously established liabilities.

Additionally, one might argue that compliance with the order to create "amended returns" caused the "loss" to the United States. The purportedly already existing liabilities asserted by the government, with interest and penalties, are excluded from the taxes calculated on either the Hendricksons' joint amended returns made in June of 2010 or Mrs. Hendrickson's single amended returns made in January of 2011. Although the Hendricksons indicated disagreement with their fitness for appearance on tax forms, the numbers on all of those forms were those dictated by the Court in compliance with her order. Compliantly treating those court-dictated numbers as reportable income for the purpose of calculating resultant tax liabilities after the application of deductions and other available provisions may have resulted in far lower liability figures than the government alleged was owed by the Hendricksons before these amended return

11

calculations.

Further, Mrs. Hendrickson did, in fact, file amended returns as ordered by the Court --
twice.  This was established at trial and the government does not actually dispute this.  It only
complains that the amended returns filed could not be "processed" by the IRS.

However, the Court's order did not require the Hendricksons to submit "processable
returns."  Judge Edmunds only ordered that the return be submitted in compliance with the
numbers the Court dictated.  The returns submitted by the Hendricksons together and by Mrs.
Hendrickson on her own did contain those very figures.  If the Hendricksons' inclusion of
disclaimers of responsibility for those numbers - which the Court explicitly permitted in its
statement during the June 10, 2010 hearing on the matter: "[You] can affix something to it that
says, you know, filed under protest, or anything you want that says that, you know, I disagree
with the statement that this is taxable income" - rendered them "unprocessable," this did not
render them non-compliant with the Court's order, and certainly not fraudulent.

Putting aside the question of how one could engage in contemptuous behavior by
asserting an allegedly non-compliant position when the compliance is ultimately measured by the
receipt of the information,[6] the fact that Mrs. Hendrickson qualified her declarations on her
amended returns did not render the information such that the Internal Revenue Service could not
calculate a tax liability. Hence, no loss – intended or actual – could result from Mrs.
Hendrickson's qualification of the returns.

In light of this above, a loss was neither caused nor intended by Mrs. Hendrickson's

---

[6] This question is exacerbated by the inability to infer anything from the jury's verdict.

failure to file processable amended tax returns.[7]

> **b)**   **No Loss Base Adjustment is supported by Mrs. Hendrickson's Five Dollar ($5.00) Tax Refund for 2008.**

Regarding the other alleged act of contempt - that Mrs. Hendrickson filed a false claim for refund for the 2008 tax year - that action did not result in an actual or intended loss to the United States warranting a loss-based guideline enhancement under U.S.S.G. § 2B1.1(b).  First, Mrs. Hendrickson maintains that no actual loss has been proven.  It is her view that the United States has never been determined to be owed the $5.00 Mrs. Hendrickson claimed on the 2008 filing.  The United States cannot "lose" or can one intend to cause a loss of that which has not yet been proven to belong to the United States.  Second and more importantly to the immediate concern, if Mrs. Hendrickson's conduct with respect to her 2008 return caused any loss, or if the

---

[7]  Additionally, the Court's Orders did not direct Mrs. Hendrickson to pay anything.  Mrs. Hendrickson was found to be jointly indebted to the United States in that Amendment Judgment, but no "order of payment" was made.  *See* Exhibit 2.

  Thus Mrs. Hendrickson's alleged non-compliance with the directives of Paragraph 27 of the Amended Judgment – to which the Indictment in this case explicitly and exclusively confines the charge – has no relationship to any alleged existing liability.

  Further, since Mrs. Hendrickson believes the amounts outstanding for 2002 and 2003 are without legitimate basis, in any event, she could not intend a loss.  Additionally, those amounts were the verbatim product of a purported "examination report" introduced as support for the government's Motion for Summary Judgment in the civil case before the Court. As confirmed by trial testimony of the DOJ attorney who introduced them in that case, the purported "examination report" was actually *not* an examination report at all.  *See* Exhibit 6, trial transcript of Robert Metcalfe testimony.

  The balances from an actual Internal Revenue Service examination report which was presented as a formal document, and accepted as such by Chief Judge Rosen of this district in 2010, are only $1,816 for 2002 and $1,346.80 for 2003, for a total of $3,162.80. This amount is well-below the $5,000 threshold indicated in the USSG at §2B1.1(b)(1) as the baseline for any consideration in sentencing. *See* Exhibit 7, Form 4549 introduced in support of government's sentencing memorandum in *United States of America v. Peter E. Hendrickson*, case #2:08-cr-20585, Dkt. #96-1.

13

Court finds she intended to cause a loss, it is limited to $5.00 and, hence, cannot support a loss

base adjustment under Section 2B1.1(b)(1).

In light of the foregoing, it is clear that Mrs. Hendrickson did not engage in any fraud or

deceit concerning her 2008 tax return, and no loss or intended loss to the United States can be

ascribed to her actions. Thus, if the Court applies the fraud guidelines, no "loss" even remotely

approaching the $5,000 threshold indicated at Section 2B1.1(b)(1) can be ascribed to Mrs.

Hendrickson's behavior relevant to the conviction in this case.

### 3.      Assuming That U.S.S.G. § 2B1.1 Does Apply, a Non-Custodial Sentence is Nonetheless Advised.

Even if this Court concludes that U.S.S.G. § 2B1.1 applies to this case, proper application

of that Section nonetheless advises a non-custodial sentence.  Under Section 2B1.1, the Base

Offense Level is "6."  *See* PIR ¶ 28.  Because neither of the enhancements to the Base Offense

Level suggested by the government and Probation Department are applicable, were the Court to

apply Section 2B1.1, the total offense level would remain a 6.

The PIR recommends that four points be added to Mrs. Hendrickson's base offense level

based on the alleged fraud loss amount.  For the reasons discussed above, there is no basis to

apply a four (4) level enhancement under Section 2B1.1(b)(1)(c).

Likewise is there no basis to apply a two (2) level enhancement pursuant to U.S.S.G. §

2B1.1(b)(1)(C) based on the offense involving a fraudulent violation of a prior judicial order.

The commentary concerning the application of Section 2B1.1(b)(9)(C) clarifies that this

enhancement does not apply in Mrs. Hendrickson's case.  Specifically, the relevant Application

Note titled "Fraud in Contravention of Prior Judicial Order" indicates that this enhancement is

appropriate:

14

> if the defendant commits a fraud in contravention of
> a prior official judicial or administrative warning in
> the form of an order, injunction, decree, or process
> to take or not take a specific action.

U.S.S.G. § 2B1.1, Application Note 7(C).  By its language, this enhancement applies only where a defendant violates a prior order *through fraudulent conduct*.  As discussed above, Mrs. Hendrickson committed no fraud when ostensibly violating the Court's Order.

In sum, even arguing within the framework of the otherwise-inapplicable sentencing calculations, because the Court did not find Mrs. Hendrickson to have committed any kind of fraud - despite government allegations to this effect - and did not enjoin Mrs. Hendrickson from filing "fraudulent" (or even merely "false" ) returns; because fraud was neither alleged in the Indictment nor proven in any way by the government; and because Mrs. Hendrickson was painstaking in preventing any possibility of deception or misunderstanding in her filings, it cannot be fairly said that she was charged with, committed, or found guilty of "a violation of a prior specific judicial order enjoining fraudulent behavior."

As the foregoing demonstrates, even if the Court applies U.S.S.G. § 2B1.1, there is no basis to apply the specific offense characteristic outlined at U.S.S.G. § 2B1.1(b)(9)(C).  No guideline should apply and no fraud-related enhancement is appropriate.

### 4.    There is no Basis to Impose an Obstruction Enhancement under U.S.S.G. § 3C1.1.

Although the Probation Department has not recommended application of an obstruction enhancement under U.S.S.G. § 3C1.1, in its response to the draft PIR and to Mrs. Hendrickson's *pro se* sentencing memorandum, the government urges the Court to do so.  Specifically, the government unwarrantedly suggests that Mrs. Hendrickson committed perjury when she testified

at trial.  The portion of her testimony cited by the government in support of this argument concerns Mrs. Hendrickson's testimony regarding the history of government efforts to suppress Peter Hendrickson's book, *Cracking the Code*....  *See* Government Response to Defendant's Sentencing Memorandum, filed December 1, 2014, at pp. 14-18.  The government's argument that this obstruction of justice enhancement should apply is without merit.

In essence, the government suggests Mrs. Hendrickson perjured herself when she referred to various actions taken by the Internal Revenue Service aimed at keeping Peter Hendrickson from speaking freely about his views concerning the tax laws as "injunctions." Although Mrs. Hendrickson may have brought a lay person's lack of hyper-technicality to her descriptions, she certainly had a basis to see the actions in question as efforts to prohibit and even enjoin her husband's speech.  For example, attached hereto as Exhibit 8 is a letter dated February 18, 2014 from Internal Revenue Service Agent Heidi Beukema to Peter Hendrickson stating that the Internal Revenue Service is "considering an injunctive action," an accompanying "Information Document Request" identifying the focus of the action as Mr. Hendrickson's book, *Cracking the Code*,  and pages from a DOJ filing in one of the subsequent lawsuits explaining its purpose as to determine "whether [Mr. Hendrickson] can be enjoined."

Interestingly, government counsel - who now urges an obstruction enhancement based on Mrs. Hendrickson's alleged misstatement - herself misstated the nature of some of the very Internal Revenue Service actions in question.  At trial, government counsel referred to some IRS actions, which the government claims Mrs. Hendrickson intentionally misrepresented, as efforts "to get [Peter Hendrickson] to produce documents to the Internal Revenue Service as part of an audit that was being conducted."  *See* Exhibit 9, Trial Testimony trial dated July 25, 2014, p. 16,

lines 7-8.  There was, however, no audit at that time.  In its response to Mrs. Hendrickson's post-verdict motions, the government acknowledged this mistake.

     If anyone was guilty of practicing deceptions on the Court, it was not Mrs. Hendrickson. In fact, government counsel incorrectly premised questions in this regard suggesting the existence of an audit where one did not exist; a claim which was later corrected as follows:

> Because revenue agents are responsible for conducting civil tax audits, it was entirely proper for government counsel to refer to [RA Heidi Beukema's] activities in that manner.

(Dkt. #109, Govt. Resp. to Motion, p. 8.).    Curiously, even though the government mischaracterized the same Internal Revenue Service actions about which Mrs. Hendrickson spoke accurately, if as a layperson, the government now suggests perjury by Mrs. Hendrickson.

     In this instance, the evidence reveals only that Mrs. Hendrickson was somewhat confused in describing the technical nature of the IRS actions about which she was questioned and there is no basis for an enhancement under U.S.S.G. § 3C1.1.  The Sentencing Guidelines themselves reveal the limited applicability of an obstruction enhancement for perjury when it relates to a defendant's right to testify.  Specifically, the Application Note states:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the Court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

U.S.S.G. § 2C1.1, Application Note 2.  The sort of mistaken or confused testimony referenced in the above Application Note is precisely the sort of testimony the government now cites in support of its argument that an obstruction of justice enhancement should apply.

     The government bears the burden of proving that an obstruction of justice enhancement

applies under U.S.S.G. § 3C1.1 based on alleged false testimony.  *See United States v. Williams,*
709 F.3d 1183, 1186 (6th Cir. 20131) (to sustain application of U.S.S.G. § 3C1.1, the testimony
must be false, material, and intended to be so).  In this instance, Mrs. Hendrickson's direct
testimony was substantively accurate and certainly truthful to the best of her ability to describe
the events in question, and there is no basis to suggest that her momentary use of technically
incorrect words during cross-examination was anything other than a good faith mistake made as
a result of (possibly intentional) confusing and misleading questioning by the government.

There exists no basis to apply an obstruction enhancement under U.S.S.G. § 3C1.1.


### 5. Mrs. Hendrickson Should be Accredited One Criminal History Point, not Three, and her Criminal History Category is Therefore I.

Mrs. Hendrickson objects to the inclusion of two additional points to her criminal history
computation pursuant to U.S.S.G. § 4A1.1(d).  Section 4A1.1(d) instructs that 2 points are to be
added to a defendant's criminal history computation "if the defendant committed the instant
offense while under any justice sentence, including probation, parole, supervised release,
imprisonment, work release, or escape status."  Because of the ambiguity of the verdict in this
case - specifically, the lack of certainty over which alleged act of contempt the jury found Mrs.
Hendrickson to have committed - her ostensibly contemptuous conduct may have fallen outside
the time period of her probation.  This ambiguous issue of fact should be determined in Mrs.
Hendrickson's favor and the additional criminal history points not applied.

The jury in Mrs. Hendrickson's case was permitted, pursuant to the charge presented to
them by the Court, to find her guilty of contempt with respect to two allegedly contemptuous
acts:  (1) her failure to file amended tax returns in a manner compliant with the Court's earlier
Order, of which she would have been in violation of on June 2, 2007 or (2) her filing of a tax

18

return in 2009 for the tax year 2008 in a way that was allegedly consistent with the tenets of her husband's book, *Cracking the Code*....   Meanwhile, the period of probation Mrs. Hendrickson served pursuant to a DUI conviction - which provides the basis for the two point increase in question - terminated on June 26, 2007.  *See* Exhibit 10 - Order of early discharge from probation.[8]   Thus, if the conduct that the jury found Mrs. Hendrickson guilty of was (1) her failure to file amended tax returns as directed by the Court, she would have been on probation at the time she committed her instant offense.  In contrast, if the jury did not conclude that she committed contempt in this first instance, but rather (2) found her 2009 tax filing constituted criminal conduct, she would *not* have been on probation during the relevant time period and the two point increase could not be properly applicable to her criminal history calculation.

There is no way for the Court to know whether the jury in Mrs. Hendrickson's case concluded that she committed criminal contempt based on her actions in June of 2007, in 2009 or both.  This ambiguity cannot be ignored or eliminated.  The principles of justice in our criminal system should compel the Court to resolve this ambiguity in Mrs. Hendrickson's favor.  *See United States v. Lawrence*, 555 F.3d 254, 260 (6th Cir. 2009) ("rule of lenity" directs courts to resolve ambiguity in favor of defendants).  As such, should the Court apply the sentencing guidelines in this case, Mrs. Hendrickson should be accredited with one criminal history point and given a criminal history category of I.

Assuming the Court applies the fraud guidelines - which Mrs. Hendrickson maintains do not apply - she would have a total offense level of 6 and criminal history category of I.  This results in a recommended sentencing range of 0-6 months.  Pursuant to U.S.S.G. §5B1.1(a), a sentence of probation is authorized under these circumstances and according to U.S.S.G.

---

[8] To the extent PIR ¶ 38 suggests Mrs. Hendrickson's probation terminated on September 13, 2007, the PIR is wrong and should be corrected.

§5E1.2(c)(3), the appropriate fine range is $500 to $5000, although a fine may be waived if Mrs. Hendrickson is deemed unable to pay one.

Thus, even if the sentencing guidelines are applied, they call for a probationary sentence and support Mrs. Hendrickson's argument that the Court should impose just such a sentence in her case.

### B.    Section 3553(a) Analysis

Under the analytical rubric governing the imposition of sentence, once the Court makes guideline findings - or finds that the guidelines do not apply, as Mrs. Hendrickson suggests - the Court must then undertake an analysis under 18 U.S.C. § 3553(a).  Application of the sentencing factors set forth at Section 3553(a) demonstrates that a probationary sentence would be minimally sufficient to meet the goals of sentencing in Mrs. Hendrickson's case.

Specifically, Mrs. Hendrickson proposes that the Court sentence her to a probationary term with whatever reasonable conditions the Court may determine are necessary.  If Mrs. Hendrickson violates the terms of her probation, the Court would accordingly be entitled to imprison her.  Such a sentence would best serve to fulfill the purposes of punishment that guide the imposition of sentence in this case.

### 1.    The Nature and Circumstances of the Offense and the Personal History and Characteristics of the Defendant.

#### a)    The Nature and Circumstances of the Offense.

The unique facts of this case make clear that in exercising its sound discretion, the Court should impose a non-custodial sentence.  Having overseen two jury trials in this matter, during which Mrs. Hendrickson represented herself *pro se*, the Court is very familiar with the nature

and circumstances of her offense, her perspective of the law underlying the case against her and the extent to which she disagrees with the Court's various rulings and the legitimacy of her conviction. Nevertheless, Mrs. Hendrickson maintains that she has always been nothing but honest and forthright with the Court and has steadfastly and sincerely stood by her beliefs with respect to what her obligations and rights are as an American citizen; even though she now faces punishment as a consequence of those beliefs.

### b)  <u>Personal History and Characteristics of the Defendant.</u>

Mrs. Hendrickson is a person of good character, a cherished and respected member of and asset to her community. She respectfully asks the Court to take these facts into account in determining her sentence.

Mrs. Hendrickson's personal history speaks strongly of her good character. A lifelong Michiganian, she spent ten years as a beloved teacher in local public and private secondary schools. This decade of service to the community was followed by additional years giving of herself as an underpaid but much appreciated private tutor, helping young people from all over the area learn math, physics and chemistry and doing ACT prep with those bound for college.

At the same time, Mrs. Hendrickson, along with her husband, raised two children, Kathryn Elizabeth (Katie) (age 23) and Thomas Jefferson (TJ) (age 19). Resolved to give her children as good an education as possible, no matter what the sacrifice, Mrs. Hendrickson forewent a second paycheck coming into the household and devoted herself to home-schooling her children and helping those in the local homeschooling community. Years of hard work and dedication ended with Katie securing a full scholarship at Lawrence Technological University

2:13-cr-20371-VAR-LJM   Doc # 122   Filed 03/18/15   Pg 22 of 32   Pg ID 2520

(graduating in 2013) and TJ turning 18 with three semesters on the Dean's list at Oakland Community College already under his belt.

Mrs. Hendrickson has always held and concretely expressed a deep faith in the institutions of this country, its established procedures of law and political processes.  She is a lifelong voter, never missing a single occasion to act as a good, responsible and diligently-educated citizen, even in local elections.  Mrs. Hendrickson has run for and been elected to political office several times, most recently to the office of Republican Party Precinct Delegate just this past August.  She continues to calmly pursue legal remedies to the outcome of this trial, confident in her ultimate exoneration.

Mrs. Hendrickson's good character is reflected in the warmth with which she is cherished by her many friends and acquaintances of all circumstances and from throughout the country, and their recognition of the value she has brought to their lives.[9]  For instance, Dr. James Allen of Philadelphia describes Doreen as:

> [T]he kind of person that places the interests of others above her own."

He goes on to state:

> While we were visiting with her and her family she took a special interest in the home schooling program that we were working on for our son A.J., who was ten at the time.... She shared her thoughts with my wife and me, based on her background in math and science education, to improve the program that we had been using with our son. She gave us stacks of books and other written materials, generously, without a second thought. Consequently, at least partly because of Doreen's input, our son A.J. has excelled in his studies;... Doreen is a gentle, kind-hearted soul...

---

[9] Attached hereto as Exhibit 11 are copies of a series of character letters written on behalf of Mrs. Hendrickson.

Advertising writer and journalist Tim O'Brien of Allen Park, Michigan, writes:

> While I don't know the specifics of the offense for which Doreen was convicted I do know Doreen. In fact I have known her for, literally, decades. I know her to be a highly principled person — devoted not only to her husband and children but to the community as a whole.
>
> I can't imagine her ever doing anything that would bring the slightest harm to anyone. I ask you to please take that into consideration in determining her sentence.
>
> What I look for and hope for in our criminal justice system is to be protected from predators. I can't imagine a more unlikely, more totally incongruous description of Doreen Hendrickson.

United States Congressman Kerry Bentivolio, who knows Doreen well, writes:

> I consider Doreen to be of high moral character and a positive contributor to our community. 1 know her to be hardworking and honest. Time away from her family and community would only be a negative for all parties involved. I am therefore asking the court to give Doreen Hendrickson as lenient a sentence as possible.

Debra Blashfield shares a personal story highlighting Doreen's good and selfless heart:

> I believe it was 2001 when I had major surgery which required the dressing of the surgical site changed daily. I was a widow with one male child. Doreen, although already busy with her own family (a husband and two children), as well as the responsibility of home-schooling her children and keeping up with their extra activities (soccer, special classes, etc.) came to my home every day for weeks to change the dressing from my surgery. She did this at great expense to her own schedule. I'm sure there were days she wanted to be done with it all, but she never made me feel as though I was upsetting her schedule.

23

Brother-in-law Rob Hendrickson asks the Court:

> I hope you will take her good character into account as you make your decision. She is a good person, a devoted wife and mother and supportive friend to many, many people. I truly believe and hope you will as well, that it would serve no good purpose to take her away from all the good she does for so many.

Sister-in-law Kim Leffler also knows Doreen well:

> A characteristic indicative of Doreen is the loving way she interacted with my father, a sweet and brilliant man who unfortunately fell victim to Alzheimer's. As his mind clouded he occasionally became irascible and difficult. Doreen was unfailingly kind and compassionate to my father, treating him as affectionately as if he were her own parent, which helped us all to cope with his condition. Her nature is kind and compassionate - doing wrong is not part of her makeup.

Brian Harriss, an engineer in Alaska, says of Doreen:

> I first became acquainted with her when inquiring about tutoring services and learning resources for my young toddler. ... Doreen has been very thoughtful and generous with my now three-year-old son. Since I've known her, she has sent, on a couple of different occasions, learning tools appropriate for my son.

> Most recently, when I visited Doreen and her family at their home in Commerce Township, she gave me a wooden puzzle of the United States to take home to my toddler. Since my son loves puzzles, he had the puzzle mastered in a few days.

> Kind, soft-spoken individuals like Doreen who truly care about other people and the growth and development of children make her a valuable part of any community.

Farmington Hills lawyer Jaelle Eby describes Doreen as a model citizen:

> Doreen is honest, friendly and generous. She has given my six kids countless gifts over the years, rides to work and moral support. ... She has also offered to tutor them in many subjects. Her kids, Katie and T.J. are great - kind, intelligent and hard working. Doreen has been a model citizen in all the years that I've known her and I trust her completely.

Farmington teacher Julia Dessert writes:

> Doreen is a person who loves her country. She is a history buff and even named her son T.J. after Thomas Jefferson. Doreen doesn't have to be reminded to vote. Doreen is a person of strong moral character. She wants to see her family, her friends, and her community thrive. For these reasons, I thank you, in advance, for treating Mrs. Hendrickson with fairness and leniency.

And Arizona non-profit 'Servant Leaders International' director Sarah Waltner wants the

Court to know Doreen:

> I want to share what I have learned about this extraordinary woman based on my personal experience with her over the past few years. She has astonished me with how much she has blessed me and my family.
>
> At a time of indigence - my husband out of work for several years and all of our resources depleted - Doreen sent us crates of beef, chicken and fish every month. Considering what we try to do with starving orphans in other countries, it was humbling for us to be at the receiving end of such gifts. They came when we needed them most, and her generosity made it possible for us to get by and to stay healthy. Doreen never made us feel embarrassed, either, or beholden to her because of these gifts. Giving is a part of her nature, and she gave this food with such grace, humor, and tact that she made it easy for us to be accepting of it. We never felt judged by her because of our circumstances. Her charitable nature seemed to

25

come from a sense of gratefulness for what she had, which was also modest. This fact made the gifts that much more remarkable and special. We will always be thankful for her thoughtfulness.

Two years ago, in order to escape the bullying and poor instruction that my son was experiencing in a local public school, my husband and I decided to withdraw him and home-school him for a year. Without hesitation, Doreen sent to us boxes of educational books so that the task would not be too overwhelming for me. She did it out of a passion for home schooling and out of a true sense of camaraderie with me over the challenges in raising children. She and I share strong feelings about the importance of providing them with a fine education in a healthy environment. She was sensitive to the fact that my husband and I found the task daunting, and came alongside of us to encourage us and to support the endeavor. As a result of that time, and in no small part because of Doreen's contributions, my son discovered the fun of learning again, became an avid reader, did remarkably well in his home school program, and eventually was offered a place in a fine preparatory academy. Doreen continues to send him educational magazines and other materials from time to time, and my son receives them with great excitement.

I have also been impressed with the fact that Doreen appears utterly to lack what I can only describe as a kind of American idolatrous worship of material things. Spending time among people abroad and then coming home, I have become acutely aware of the American consumerism, selfish ambition, greed, and sense of entitlement that foreigners see in us. Watching television in southern Africa and seeing American commercial advertising is just embarrassing. Doreen does not participate in the mindless acquisition of stuff or in seeking after status. She exemplifies the virtues of sharing and community involvement. She is humble, and aware of how blessed she is with the things that she cares most about - particularly family. From what I can see, her priorities are simple: she spends all of her time educating, supporting, nurturing, encouraging,

and mentoring her children. I have seen her discussing with them the importance of personal integrity, obedience, mutual respect for properly and person, and responsibility. I believe that our children reflect who we are and what we value most, because they absorb what we download into them day after day. Her children, whom I have come to know, are warm, loving, honest, hard-working, respectful, enterprising and trustworthy young adults—in short, they exhibit all of the qualities that we try to instill in the youth with whom we work in the Third World. Doreen's investment in her children has produced exceptional results. She continues to have a positive impact not only on them, but also on their friends in the community. Doreen's character - most of all her generosity of spirit and love for children - has touched me deeply and has expressed itself in tangible ways that have been very meaningful to me and to my family.

The foregoing excerpts from the many letters submitted to the Court demonstrate the extent to which Mrs. Hendrickson has helped so many people in her community and beyond. Her beliefs may not always comport with the mainstream, but the sincerity of her beliefs, and love and devotion to her family and friends, cannot be questioned.

## 2.    The Kind of Sentences Available.

The Court can freely impose a probationary sentence. This case involves no minimum mandatory sentence. As discussed above, the Sentencing Guidelines do not apply and, assuming they do, they advise/authorize probation. If the Court disagrees with Mrs. Hendrickson's position concerning the application and calculation of the Guidelines, the facts of this case certainly support a variance. No matter what analytical route is taken, probation represents an appropriate sentence.

3.      **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.**

As discussed below, probation is no proverbial "walk in the park." Mrs. Hendrickson's sentencing proposal would most-effectively serve this sentencing factor by imposing a punishment that is proportional to the severity of her underlying offense while including conditions that would dictate her conduct while on probation, and thereby obligate her to respect the law. Her failure to do so would be at her own peril, in that the Court could increase the severity of her punishment and/or imprison her. Probation with a liberty restraint (home detention and/or community service), if necessary, strikes the appropriate balance between imposing an overly-harsh punishment and one that would not sufficiently address the sort of remedial effects the Court should seek to achieve while imposing sentence.

In suggesting a probationary sentence, Mrs. Hendrickson directs the Court to the Supreme Court's view concerning the severity of probation. The Supreme Court has stated "probation, rather than 'an act of leniency' is a 'substantial restriction of freedom.'" *Gall v. United States,* 552 U.S. 38, 44 (2007) (quoting with approval district court's characterization of a sentence of probation). *See also United States v. Coughlin,* No. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent [sic] of crime and amply retributive"). The Supreme Court has recognized that the all-too-frequent practice of "quantifying the variance as a certain percentage of the . . . sentence recommended by the Guidelines gives no weight to the *substantial restriction of freedom* involved in a term of supervised release or probation." *Gall,* 552 U.S. at 48 (internal quotation marks and citation omitted) (emphasis added).

In the Supreme Court's view, even though "custodial sentences are qualitatively more

severe than probationary sentences . . . [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.* For example:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

*Id.* These sorts of conditions "can have a significant impact on both [the probationer] and society. . . . Often these conditions comprehensively regulate significant facets of their day-to-day lives." *Id.* at 49 n.4 (internal quotation marks and citation omitted) (citing examples including frequent searches by government officials).

Of course a sentencing court that finds the standard conditions insufficiently restrictive may impose additional "special conditions" as necessary. *Id.* at 48 ("Offenders on probation are subject to several conditions that substantially restrict their liberty").  For example, the Court could impose extended community service to the standard conditions of probation. Such conditions will assure the just punishment of Mrs. Hendrickson, while also furthering the other goals of sentencing. *Cf.* 18 U.S.C. § 3553(a)(2). Under these circumstances, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *Id.* at 54 (internal quotation marks and citations omitted).

When viewed in the light of these teachings, it becomes clear that a probationary sentence in this case would provide just punishment and promote respect for the law.

    **4.**    **The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant.**

Probation would also serve to effectively deter both Mrs. Hendrickson (specific deterrence) and others who may be inclined to commit her same crimes (general deterrence). Should the Court sentence Mrs. Hendrickson to a period of probation, she would be subject to conditions. If she does not comply with those conditions, she could be imprisoned for violating the terms of her probation. This would be the most-effective means of influencing Mrs. Hendrickson's conduct and effectuating the need for specific deterrence in this case.

With respect to general deterrence, anyone contemplating contemptuous behavior, even if coupled with absolute good faith, who may think they can engage in the sort of conduct Mrs. Hendrickson has engaged in without consequence now knows that should they do so, they will be arrested, prosecuted, convicted and sentenced. As such, the proposed sentence will afford adequate deterrence to criminal conduct.

Mrs. Hendrickson's actions do not constitute a danger to the public; hence, the public does not need to be protected from her. In any event, probation represents the least restrictive way to effectuate specific deterrence.

    **5.**    **The Need for the Sentence Imposed to Provide the Defendant With Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

Mrs. Hendrickson is healthy, has struggled with no addictions and is well-educated. As such, the concerns set forth in this sentencing factor do not apply to her.

**6.** **The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records who have been Found Guilty of Similar Conduct.**

Given the unique circumstances behind Mrs. Hendrickson's case, the above factor cannot be meaningfully applied in her case.

**7.** **The Need to Provide Restitution to any Victims of the Offense.**

Restitution does not apply to Mrs. Hendrickson's offense.  (PIR ¶¶ 78 and 79).

## III.   CONCLUSION

For the foregoing reasons, Mrs. Hendrickson respectfully requests that the Court impose a sentence of probation.

Respectfully submitted,

CEDRONE & MANCANO, LLC

Dated:  March 18, 2015          By:     */s Mark E. Cedrone*
MARK E. CEDRONE, ESQUIRE
123 South Broad Street – Suite 810
Philadelphia, PA 19109
Tele:  215.925.2500
E-Mail:  mec@cedrone-mancano.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served this 18th day of March, 2015, via the Court's Electronic Case Filing ("ECF") System, upon the following:

**Melissa S. Siskind**
U.S. Department of Justice, Tax Division
P.O. Box 972, Ben Franklin Station
Washington, DC 20044
Email: Melissa.S.Siskind@usdoj.gov

**Jeffrey Bender**
U.S. Department of Justice
Northern Criminal Enforcement Section
Tax Division
601 D Street, NW
Room 7818
Washington, DC 20530
Email: jeffrey.b.bender@usdoj.gov

**Jeffrey A. McLellan**
U.S. Department of Justice
Tax Division
P.O. Box 972
Washington, DC 20044
Email: jeffrey.a.mclellan@usdoj.gov

**Ross I. MacKenzie**
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226
Email: ross.mackenzie@usdoj.gov

*/s Mark E. Cedrone*
MARK E. CEDRONE